**Howard R. WILLARD, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 379S74.**

Supreme Court of Indiana.

Feb. 20, 1980.

J. Michael Trueblood, Lafayette, for appellant.

Theodore L. Sendak, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Appellant Howard Willard was charged in Marion County Criminal Court No. 4 with eight counts, as follows: conspiracy to commit a felony, to-wit: first degree burglary, Ind.Code § 35–1–111–1 (Burns 1975); two counts of first degree burglary, § 35–13–4–4; two counts of commission of a felony while armed, § 35–12–1–1; first degree murder, § 35–13–4–1; conspiracy to commit a felony, to-wit: first degree arson, § 35–1–11–1; and first degree arson, § 35–16–1–1. He was tried to a jury and found guilty on all eight counts. The trial court sentenced appellant to two to fourteen years on Count I, two to twenty years on Count II, two to fourteen years on Count III, ten to twenty years on Count IV, twenty-six years on Count V, life imprisonment on Count VI, two to fourteen years on Count VII, and five to twenty years on Count VIII, together with thirty-five years disenfranchisement. These sentences were to run concurrently after appellant completed the term he was serving at that time.

Appellant Willard raises seven issues on this appeal, concerning: (1) whether the trial court erred in refusing to quash a search warrant and in admitting evidence seized pursuant to the warrant; (2) whether the trial court erred in refusing to grant the defendant a change of venue from Marion County; (3) whether the trial court erred in denying the defendant's motion for severance; (4) whether the trial court erred in denying defendant's motion for a mistrial due to the trial court's approval, sanction and facilitation of extensive electronic news media coverage of the proceedings within and near the courtroom; (5) whether appellant's convictions for felony murder and committing a felony while armed should be set aside; (6) whether the trial court erred in permitting the sequestered jury to tour the Marion County Jail; (7) whether the evidence was sufficient to sustain the verdicts on Count II, IV and VIII.

On May 7, 1977, the Marion County Sheriff's Police were called to the home of Marjorie Jackson at 6490 Spring Mill Road in Indianapolis. Portions of the residence were in flames, and a great deal of smoke was coming through the window on the front of the house. The front gate of the fence at the front of the residence was secured with several locks and chains, but several wires of the fence at the rear of the property had been cut. The doorway to the residence was ajar, and the door showed signs of a forced entry. The body of the victim, Marjorie Jackson, was found on the floor in the kitchen. An accelerant had been used to start the fire, and a Mopar gasoline can was found in the house. An autopsy indicated that Marjorie Jackson died from a gunshot wound to the abdomen, which probably had been inflicted two to four days prior to the fire. The rooms of the home were in disarray, and a great deal of cash was found in and about the home in sacks and tool boxes.

From January through May of 1976, Marjorie Jackson withdrew $6,400,000 in cash from Indiana National Bank. At her request, the money was paid in one-hundred-dollar and twenty-dollar denominations. The cash was obtained by Indiana National Bank from the Federal Reserve Bank in Chicago, which recorded the serial numbers of the bills. The money which subsequently surfaced in this case came from among the bills transferred from the Federal Reserve Bank to Indiana National Bank and subsequently to Marjorie Jackson.

Appellant, together with several other persons, became aware that Marjorie Jackson kept large amounts of cash in her home and laid plans to obtain it. They broke into the home a number of times and took large amounts of cash. On one occasion, Marjorie Jackson confronted them, and they shot and killed her. The evidence tended to show that one of appellant's accomplices, Manuel Robinson, shot Marjorie Jackson with a rifle while in the home with appellant Willard.

Appellant and his cohorts set the fire in an attempt to disguise the robbery and murder of Marjorie Jackson and to destroy any identifying evidence they might have left in the home.

From May 2 through May 6, 1977, appellant and Marjorie Pollitt deposited large sums of money on several occasions in two Mooresville, Indiana banks. They also went to Pat's Tavern in Mooresville and bought rounds of drinks for an hour for the other customers, paying for the drinks with twenty-dollar bills. Willard and Pollitt also went to Strickland Motors in Indianapolis on May 2, and purchased a new $15,000 automobile, which they paid for in cash. They also placed a down payment of $1,000 on another new automobile. Willard and Pollitt later went to Georgia, where Mrs. Pollitt's sister joined them. They then departed for Arizona. They were apprehended in Arizona in a motor home they had recently purchased, and were found to be in possession of large amounts of cash. The serial numbers of these bills matched those on the notes transferred from the Federal Reserve Bank to Indiana National Bank and then given to Marjorie Jackson. Many people observed Willard and Pollitt with large amounts of money which they spent generously. Witnesses also heard discussions among Willard and Pollitt and their cohorts concerning the money and that it was obtained from "an old witch" who lived by herself.

I.

Appellant Willard and Marjorie Pollitt were apprehended by FBI agents in the Safari Trailer Park in Phoenix, Arizona. They were arrested pursuant to a warrant charging unlawful flight issued by the Federal District Court for the District of Arizona. Appellant Willard was apprehended at a phone booth near the office of the trailer park, and Pollitt was arrested in the motor home. After making the arrests, the FBI agents obtained the keys to the motor home and locked it. They later obtained a search warrant from a federal magistrate and searched the vehicle. Appellant filed a mo-

tion in the federal court and in the trial court here to quash the search warrant and suppress the items of evidence found in the motor home, on the grounds that the warrant contained a defective description of the motor home, and that the probable cause affidavit was insufficient.

Neither the search warrant nor the probable cause affidavit are included in the record. Proceedings on appellant's motions to quash and suppress were transferred to the Southern District of Indiana and heard by Judge James E. Noland. The transcript of the hearing before Judge Noland was stipulated into the record of the trial court here. Counsel further stipulated to the submission of the motions to quash and suppress on the basis of that transcript, and to the federal court's ruling and the briefs submitted on this matter. Although it appears the parties also agreed to place copies of the affidavit and warrant into the record before the trial court, it does not appear that this was actually done.

The State contends that appellant has thereby waived his right to have this Court consider the issue, because it was his duty to present a proper record to this Court on appeal. *See Mendez v. State* (1977), 267 Ind. 309, 370 N.E.2d 323; *Buchanan v. State* (1975), 263 Ind. 360, 332 N.E.2d 213. The State is correct in pointing out that the reviewing court normally will not consider any matters which are not contained in the record. *See Fair v. State* (1977), 266 Ind. 380, 364 N.E.2d 1007; *Hill v. State* (1977), 267 Ind. 411, 370 N.E.2d 889. Appellant asserts that the transcript of the hearing held before Judge Noland contains all of the information necessary for this Court to determine the issues raised. Although we feel the State's arguments are generally well taken, it is true the transcript does reveal the contents of the probable cause affidavit and search warrant as those documents were considered by the federal district court and by the trial court here. Therefore, we will proceed to decide this issue on the record furnished to us. *Cf. Misenheimer v. State* (1978), Ind., 374 N.E.2d 523.

The probable cause affidavit apparently recited that Howard Willard had been apprehended at the Safari Trailer Park and had told one of the FBI agents that he owned the motor home in question. The agents also obtained information from other FBI agents concerning the facts of the murder of Marjorie Jackson and the theft of several million dollars in cash, the denominations of those bills and the serial numbers of them. Further, they had obtained information concerning an automobile rented by Willard and Pollitt that was parked adjacent to the motor home at the trailer park. The rental fee for the car was paid with bills which were identified as having been in Marjorie Jackson's possession. The probable cause affidavit further stated that when Marjorie Pollitt was arrested in the motor home, she had fifteen one-hundred-dollar bills in her purse, although at that time the serial numbers had not been compared with those of the bills being sought. The warrant was issued for the purpose of searching the vehicle to attempt to find $3,000,000 which was still missing from the money known to have been taken from Marjorie Jackson's home. This wealth of information, together with the additional recitations in the affidavit that Willard and Pollitt had been apprehended at the scene with large amounts of money in their possession, and had already spent large amounts of money coming from the Jackson home, justified the trial court in finding that sufficient probable cause was presented for the issuance of the search warrant.

The search warrant contained an incorrect designation of the license number and model year of the motor home. It was designated as a 1975 model when, in fact, it was a 1977 model. The license number was on a temporary plate located in the rear window of the vehicle. When viewed from outside the vehicle, portions of the number were covered by a curtain. Thus, the number appeared to be "FX 1395," when it was actually "EX 13955." This mistake was not discovered until the interior of the vehicle was examined and the license plate was checked more closely. The trial court and the federal district court found that this was a minor defect in the description, inasmuch as there were other details of description that identified this motor home for the officers who served the warrant. The motor home was properly designated in the warrant to be located in Lot Space E–25. The general description of the motor home included details of its size, shape and color. There was also a serial number on the front of the vehicle which the warrant identified. Thus, in spite of the inaccurate recitation of the license plate number, the description of the motor home was sufficiently specific to identify it for the officers who served the warrant. Accordingly, we hold the trial court was correct in denying the motions to quash and suppress on these grounds.

II.

Appellant next contends the trial court erred in denying his motion for a change of venue from the county. He supported this motion with clippings of newspaper articles covering the commission and investigation of the crimes. Appellant also detailed the scope and frequency of newspaper, radio and television dissemination of information concerning the case throughout Marion and surrounding counties. He contends that he could not receive a fair trial in Marion County because an odium attached to his case and excitement and prejudice had built up against him. The State points out that the extensive media coverage was not designed to create prejudice against appellant as much as it dealt with the victim, a very wealthy woman who had shown eccentric characteristics by drawing $6,500,000 out of the bank and keeping it hidden in her home. Appellant's trial began on November 28, 1977, and the jury was sequestered throughout the trial. According to the evidence presented on this question, the bulk of the newspaper articles were published in May and June of 1977, with a smaller number appearing in July and some in August and October of 1977.

In order for a defendant to establish good cause for a discretionary change

of venue, he must produce evidence of community bias or prejudice sufficient to convince the trial court that he cannot obtain a fair trial in that county. *Dickens v. State* (1973), 260 Ind. 284, 295 N.E.2d 613. We will not reverse a trial court in its judgment on this issue even if there was a showing of some prejudice, where there was no reason to believe that any juror was so infected with preconceived opinions as to have been unable to judge the defendant wholly upon the law and evidence adduced at the trial. *See Williams v. State* (1979), Ind., 386 N.E.2d 670; *Webster v. State* (1978), Ind., 383 N.E.2d 328; *Daniels v. State* (1976), 264 Ind. 490, 346 N.E.2d 566; *Swininger v. State* (1976), 265 Ind. 136, 352 N.E.2d 473.

■ The transcript in this case shows that the jurors were examined on voir dire concerning their exposure to pretrial publicity and the effect it had on them. Each juror said that he was aware of the publicity and had read and heard about the case, but did not know whether the allegations were true. They also said they would be able to put aside any preconceived ideas they might have had as to the facts stated in the media and render a verdict on the evidence presented in court. Therefore, we do not find that the trial court committed reversible error in denying appellant a change of venue from the county. *Murphy v. Florida* (1975), 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589; *Bruce v. State* (1978), Ind., 375 N.E.2d 1042. *Compare Baniszewski v. State* (1970), 256 Ind. 1, 261 N.E.2d 359.

### III.

■ Appellant next argues the trial court committed reversible error by refusing to grant his motion to sever the charges. Ind.Code § 35–3.1–1–11 (Burns 1975) provides in pertinent part.

"Whenever two or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses. In all other cases the court, upon motion of the defendant or the prosecutor shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense with a view to the number of offenses charged, the complexity of the evidence to be offered, and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense."

Thus, the statute provides for a right to a severance of charges and separate trials if the charges are joined together solely because they are of the same or similar character. In all other cases, according to the statute, the determination of whether to sever the charges is committed to the trial court's discretion. In deciding this issue, the trial court must evaluate the factors listed in the statute.

■ It is apparent in this case that the charges were not joined for one trial "solely on the ground that they are of the same or similar character." All of the charges against appellant relate to the thefts of Marjorie Jackson's money from her home, the breaking and entering to accomplish this purpose, the consequent killing of Marjorie Jackson, and the arson committed in an attempt to conceal the crimes. Thus, all of these charges arose from a single, ongoing scheme, and are based on the series of acts which constituted parts of this scheme. Because it is apparent that evidence of any one of the crimes constituted evidence of the entire transaction involving all of the other crimes, it cannot be said that the evidence was too complex or that submitting all of these charges to the same jury at the same time would cause confusion. Appellant has not demonstrated that the denial of his motion for severance prevented or hindered a fair determination of his guilt or innocence on any of the charges. Therefore, he has not established an abuse of discretion by the trial court. *See Jameison v. State* (1978), Ind., 377 N.E.2d 404 (severance not mandatory where burglaries of two service stations constituted series of connected acts); *Lagenour v. State* (1978), Ind., 376 N.E.2d 475; *Lash v. State* (1977),

Ind.App., 367 N.E.2d 10. *See also Phillips v. State* (1978), Ind.App., 377 N.E.2d 666. There is no error here.

## IV.

Appellant next alleges error in the trial court's handling of the media coverage of the trial. Prior to trial, appellant objected to the trial court's planned dissemination of videotapes of the trial to the news media. Over appellant's continuing objection, the court allowed daily dissemination of the tapes to the media, and permitted live taping from an area adjacent to the courtroom. This was done not only for this trial, but as the general practice of this trial judge in the daily conduct of criminal trials in his courtroom. Television cameras set into the walls of his courtroom videotaped proceedings of the trial. The cameras were operated by court personnel from outside the courtroom. In this case, the trial judge issued written rules to the media, indicating that photographs could be taken of the proceedings through a window in the door to the rear of the courtroom, but that no photographs or film could be taken in the courtroom. He further stated that such photographs could be used anywhere outside the courtroom if used with "discretion and good taste." The court also permitted tape recorders in the courtroom, and facilitated dissemination of videotapes of the trial by making the tapes available to the media and permitting the media to take videotapes of the proceedings by plugging into the court's equipment. Appellant objected to the dissemination of the tapes to be broadcast throughout the community during the trial, but the trial judge overruled the objection with the caveat that none of the tapes were to be used in any way by the media until after the jury had been selected and sequestered. This procedure was designed to prevent the jury from seeing or hearing the tapes or recordings.

During the progress of the trial, the practice of this judge and others in the State was brought to the attention of the Indiana Commission on Judicial Qualifications. The Commission notified this judge, by a letter dated December 1, 1977, that the practice of permitting the broadcasting or recording of courtroom proceedings is in violation of Canon 3A(7) of the Code of Judicial Conduct, and advised him that any breach of this Canon would be his responsibility as judge of his court. The letter further informed Judge Wilson that any further violation of this Canon would be considered a major breach of judicial conduct and would be dealt with accordingly.

After counsel became aware of this communication from the Commission, appellant filed for a mistrial. A hearing was held outside the presence of the jury. The trial court held that, although the violation did subject him to discipline under the Code of Judicial Conduct, it did not necessarily follow that appellant Willard had been prejudiced by the procedure that had been followed to that point. The court found that because the jury was sequestered and did not know of the public dissemination of these proceedings, because the videotaping and photographing was done for the most part in an unobtrusive manner, and because the procedure was generally done in this judge's court and not particularly set up for this trial so as to highlight its importance, this defendant was not prejudiced to the extent that a mistrial should be declared. The court accordingly overruled the motion for mistrial and stopped all videotaping and photographing of the proceedings at that point.

Appellant relies on *Estes v. Texas* (1965), 381 U.S. 532, 85 S.Ct. 1627, 14 L.Ed.2d 543, to support his argument that the trial court committed reversible error. The defendant's trial in *Estes v. Texas* was a "heavily publicized and highly sensational affair." Because of its public interest, certain proceedings in that trial were televised. The defendant argued before the United States Supreme Court that he had been denied due process. Four members of the Court believed that it is not necessary to demonstrate actual prejudice caused by the broadcasting of a trial. Rather, television coverage was found to be inherently prejudicial in all criminal trials. Justices Stewart,

Black, Brennan and White dissented from the decision to reverse the case, asserting that they would not place a complete ban on television, but would look to the facts of the case to determine actual prejudice. The dissenters felt the defendant was not prejudiced in that case.

Justice Harlan agreed with the plurality that reversal was called for in the case, but he noted:

"The Estes trial was a heavily publicized and highly sensational affair. I therefore put aside all other types of cases . . . . The resolution of those further questions should await an appropriate case; the Court should proceed only step by step in this unplowed field. The opinion of the Court necessarily goes no farther, for only the four members of the majority who unreservedly join the Court's opinion would resolve those questions now."

*Id.* at 590–91, 85 S.Ct. at 1663–64, 14 L.Ed.2d at 585 (Harlan, J., concurring). After joining in two other dissenting opinions, Justice Brennan pointed out that

"only four of the five Justices voting to reverse rest on the proposition that televised criminal trials are constitutionally infirm whatever the circumstances. Although the opinion announced by my Brother Clark purports to be an 'opinion of the Court,' my Brother Harlan subscribes to a significantly less sweeping proposition. . . .

Thus, today's decision is not a blanket *constitutional* prohibition against the televising of state criminal trials.

While I joined the dissents of my Brothers Stewart and White, I do so on the understanding that their use of the expressions 'the Court's opinion' or 'the opinion of the court' refers only to those views of our four Brethren which my Brother Harlan explicitly states he shares."

*Id.* at 617, 85 S.Ct. at 1677–78, 14 L.Ed.2d at 600 (Brennan, J., dissenting) (emphasis added). Thus, a numerical majority of the United States Supreme Court took the position in *Estes v. Texas* that televised crimi-

nal trials are not necessarily prejudicial to the defendant's due process rights. Such a determination must be made on a case by case basis.

■ While the use of the recording and televising equipment by this judge was in violation of Judicial Canon 3A(7), as indicated by the Judicial Qualifications Commission in its letter, the question remains whether the effect was so prejudicial that appellant was denied due process and the trial court committed reversible error in denying appellant's motion for a mistrial. The trial court record reveals overwhelming evidence of appellant's guilt of these charges. Witnesses who had taken part in one facet or other of these activities testified as to appellant Willard's involvement. Witnesses also reported appellant's own statements concerning various facets of the commission of these crimes. Further, there was a great deal of evidence presented regarding appellant's possession and spending of large amounts of money. This money was traced through the serial numbers to cash that had been in the possession of Marjorie Jackson. Concerning the trial proceedings here, it was not shown that special equipment was set up or that a special atmosphere of importance was attached to this trial by the procedures used. In fact, the procedures employed by Judge Wilson were also utilized by him in other trials conducted in his court. Thus, no unusual "carnival atmosphere" attached to these proceedings. Further, the jury was sequestered and not made aware of the fruits of these activities. Therefore, we conclude that, although this procedure was clearly improper, the defendant in this case was not prejudiced to the extent that we must reverse the trial court and order a new trial. We think it is clear beyond a reasonable doubt that this error did not contribute to appellant's conviction. Therefore, we hold the trial court did not err in refusing to grant appellant's motion for a mistrial.

## V.

Appellant Willard was charged in Counts V and VI with committing a felony while

armed and felony murder, respectively. Manuel Robinson was also charged with these crimes. In a separate trial, Robinson was acquitted on both counts. Appellant Willard argues that because Robinson was acquitted of these charges, his convictions cannot stand under the rule we established in *Combs v. State* (1973), 260 Ind. 295, 295 N.E.2d 366. *Combs v. State* considered the situation where the principal pleaded guilty to one charge and the accessory was tried and convicted of a greater offense. We held that the conviction of the accessory should be made consistent with that of the principal where there have been two separate judicial determinations on the guilt of the accessory and principal and where they are contradictory. *Id.* at 301, 295 N.E.2d at 370, construed in *Davis v. State* (1977), 267 Ind. 152, 158–59, 368 N.E.2d 1149, 1152, and *Schmidt v. State* (1973), 261 Ind. 81, 82–83, 300 N.E.2d 86, 87–88.

The principle of *Combs v. State* does not apply in this case, however, because appellant was not charged in either Count V or VI as an accessory, but was charged as a principal *along with* Robinson. Appellant argues that the evidence tended to show that Robinson was the one who actually pulled the trigger and thereby caused the death of Marjorie Jackson. Therefore, he asserts, he was only an accessory to the murder and the attendant commission of a felony while armed. However, the evidence showed that Robinson and Willard were acting in concert when they committed the crimes. They were in and about the house at the time Marjorie Jackson was shot, and both took money from the residence after she had been shot. In addition, Marjorie Pollitt testified that appellant had the rifle in his possession immediately before and after the incident. Further, appellant told Pollitt after the incident that he and Robinson had gone to the Jackson residence together and had broken into the house together. Thus, the jury could have found that appellant was a principal in the acts and not an accessory to them. Therefore, *Combs v. State, supra,* does not apply to this case. Robinson's acquittal of these charges in a separate trial

has no effect on the convictions of appellant here, and appellant is not entitled to an acquittal on either Count. *Clark v. State* (1978), Ind., 378 N.E.2d 850, 852, *cert. denied,* 439 U.S. 1050, 99 S.Ct. 731, 58 L.Ed.2d 711. *Compare Jewell v. State* (1979), Ind., 397 N.E.2d 946, *with Davis v. State, supra.*

## VI.

Appellant next contends the trial court erred in failing to grant his motion for a mistrial after the trial judge had permitted the sequestered jury to visit the Marion County Jail prior to deliberations. Appellant urges that this practice tainted the proceedings by subjecting the jury to extraneous and improper influences, and thereby denied him a fair trial. The only evidence presented with respect to this incident was the testimony of Deputy Sheriff Summers. Deputy Summers testified that the jury received the same tour any social group could have obtained, and that the jury was not allowed into any area where the defendant or his confederates were located. In fact, the jurors were not allowed to view any of the cell blocks or to converse with any of the inmates. There was no evidence that anything occurred on the tour which might have adversely influenced the jury. Nor is there any indication that the jury received any extraneous information about this case. We have only appellant's allegation that the tour itself had an unwholesome effect on the jury and adversely influenced them.

We have established that before outside information is deemed sufficiently influential so as to necessitate a reversal, the extraneous information must affect the substantial rights of the accused and subject him to substantial peril. In *Bruce v. State* (1978), Ind., 375 N.E.2d 1042, this Court considered a situation in which a bailiff entered the jury room during deliberations to deliver coffee to the jurors. We stated in that case: "Only communications relating to the substantive rights of the accused give rise to presumptions of harm; such communications usually involve *ex*

*parte* delivery of legal opinions or instructions to the jury." *Id.* at 375 N.E.2d at 1068. The management of the jury during a trial is within the sound discretion of the trial judge. The jury in this case did not have any contact with the cell block area or any of the inmates, and did not receive any extraneous information about the case. Thus, a showing that this jury was given a general tour of the jail facilities does not, by itself, raise an inference of substantial peril to appellant. Therefore, while we do not condone such activity or think it appropriate, we hold in this case that allowing the tour and denying appellant's motion for mistrial was harmless error. *See Bruce v. State, supra; Grisby v. State* (1978), Ind., 371 N.E.2d 384.

## VII.

■ Finally, appellant contends the evidence is insufficient to support the jury's verdict on Counts II and IV, which charged first degree burglary, and Count VIII, which charged arson. In reviewing a claim of insufficient evidence, this Court will not weigh the evidence or determine the credibility of witnesses. Rather, we will consider only that evidence which is most favorable to the State, together with all logical and reasonable inferences to be drawn therefrom. The verdict will be upheld so long as there is sufficient evidence of probative value from which the jury could find the defendant guilty beyond a reasonable doubt. *Love v. State* (1979), Ind., 393 N.E.2d 176, 180; *Chambers v. State* (1979), Ind., 392 N.E.2d 1156, 1161. With respect to the burglary convictions, appellant first claims the State did not prove the breaking and entering elements of the alleged burglaries. He further contends the evidence did not show that he was the one who did the breaking to make the entry.

■■ It is clear that a conviction may be sustained upon circumstantial evidence alone. *Reutz v. State* (1978), Ind., 373 N.E.2d 152, 156–57. It follows, of course, that one of the elements of the crime charted, such as the breaking and entering in a burglary, can be proved by circumstantial evidence alone, so long as that evidence meets our general standards of sufficiency. *Id.* Deputy Sheriff Ellison testified that, upon arriving at the Jackson residence on May 7, 1977, he found a door to the house ajar and observed that the door exhibited signs of a forced entry. The marks on the door appeared to be fresh, and Ellison brought this fact to the attention of other officers, particularly Detectives Young and Kirkman. Ellison testified these marks appeared as depressions in the wood, and it was his opinion they were made by a metal object. The bedroom area of the residence had been ransacked. The drawers of the bedroom furniture were open and their contents strewn about the room. Detective Young also testified as to his observations of the damage to the door and the pry marks on it.

■ To prove the "breaking and entering" elements of burglary, the prosecution does not have to show that an actual rupturing or breaking of the entry way occurred. "Breaking and entering" in this context connotes an illegal entry, even if by opening an unlocked door or window. *See, e. g., Moore v. State* (1977), 267 Ind. 270, 277–78, 369 N.E.2d 628, 632. The evidence revealed that appellant had been interested in burglarizing the Jackson residence and had told people of this interest prior to May of 1977. Ralph Wadsworth testified that he and appellant Willard discussed the burglary of the Jackson residence, and that he and appellant entered onto the Jackson property. Osa Willard and Marjorie Pollitt also recounted appellant's statements to them indicating the various acts involved in these crimes. Further, as described earlier in this opinion, there was a great deal of evidence concerning appellant's possession of large amounts of money, which he deposited in banks in Mooresville and used for purchases of various motor vehicles, and which was found in his possession when he was apprehended. All of this money was traced to Marjorie Jackson. Marjorie Pollitt led police to the location of a rifle which appellant had kept in his car and of which he had possession on May 4, 1977. Expert testimo-

ny established that the bullet that killed Marjorie Jackson was fired from this rifle. Willard and Robinson discussed in Marjorie Pollitt's presence the events of the night Marjorie Jackson was shot. Appellant told Pollitt that he and Robinson kicked open the door and went into the residence, when they were discovered by Marjorie Jackson. Robinson then shot her. Thus, there was ample evidence from which the jury could determine that the Jackson home had been burglarized, that Marjorie Jackson had been murdered, and that appellant Willard had committed these crimes.

 The same can be said of the arson charge. In addition to the evidence recited above, Marjorie Pollitt testified that she and appellant Willard had begun a trip to Florida when appellant returned to the Indianapolis area to see Robinson. Appellant and Robinson left Mooresville late one night with a gasoline can after appellant had commented that Robinson's fingerprints were probably all over the house and that he did not want Robinson to have any trouble. Later, appellant told Mrs. Pollitt that he and Robinson had gone back to the Jackson home that night. This was the same night the fire was discovered at the Jackson home. Appellant admits that the evidence presented by the State is sufficient to show that the dwelling house of Marjorie Jackson was burned as a result of arson. He contends, however, that the evidence is insufficient to show that he committed the arson. His arguments are directed primarily at some of the conflicting evidence which was presented. Many of these conflicts result from appellant's own testimony, in which he denied or gave different versions of many of the conversations and activities discussed by other witnesses. The resolution of conflicts in the evidence is, of course, within the province of the jury and we will not disturb the findings of the jury if there is sufficient evidence from which they could find appellant guilty beyond a reasonable doubt. *Love v. State, supra; Pollard v. State* (1979), Ind., 388 N.E.2d 496, 501; *Ruetz v. State, supra.* This test has clearly been met in this case. Therefore, we find no error on these issues.

Finding no reversible error, we affirm the judgment of the trial court.

All Justices concur.