Mitchell L. WATERS, Appellant,

v.

STATE of Indiana, Appellee.

No. 180S6.

Supreme Court of Indiana.

Feb. 4, 1981.

J. A. Cummins, Public Defender, Muncie, for appellant.

Linley E. Pearson, Atty. Gen., Stephen J. Cuthbert, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

On August 1, 1979, appellant Waters was found guilty of murder by a jury in Delaware Superior Court. He was sentenced to life imprisonment. He appeals.

The evidence at trial revealed that on February 1, 1977, Larry Brown left his former wife's home at approximately 7:24 p. m. to meet with Mitchell Waters at a tire warehouse on Lilac Lane. The purpose of the meeting was to collect some checks for tires that Waters had bought on credit from Larry Brown's employer. When Larry Brown did not return in an hour as he had promised, Diane Brown looked for him at his house and at his employer's store, White Flash Petroleum. Brown's truck was parked there and was locked. Mitchell Waters, the appellant, told Diane Brown on the telephone that he hadn't seen Larry Brown since Saturday. The next evening, February 2, she reported Larry Brown as a missing person. Several persons, including relatives of Brown were concerned about what had happened to him and went down to the warehouse because of reports of a very bad odor emanating from that area in the following months.

Over two years later, on March 19, 1979, Robert Poole was cleaning out a warehouse on Lilac Lane where tires were stored. When he emptied the old tires out of the end section, a body was found underneath them which was later identified as the remains of Larry Brown. Mitchell Waters had rented and used that section of the warehouse before Poole cleaned it out. When an autopsy was performed on the deceased, a bullet was found in the skull.

Prior to March 20, 1979, Delaware County Sheriff Gary Carmichael and his deputies responded to a call from the owners of a house which appellant Waters had occupied as a tenant. They wanted Sheriff Carmichael to accompany them as they looked inside the house to observe its condition. On March 20, the Sheriff and deputies and the owners entered the house. A set of keys, a coat, a copy of a stop payment order and cancelled checks were seized.

The keys were identified as Larry Brown's keys for his truck and for White Flash Petroleum. Diane Brown had given Larry Brown the key ring, which matched one she had. She had seen the key ring in his possession on the last night she had seen him. The stop payment orders were on checks issued to Larry Brown by Waters.

Appellant contends that the trial court erred in denying his motion in limine and in

allowing State's witness Dwayne Hendrickson to testify, in overruling a motion to suppress and in admitting evidence seized in a search, and that the evidence is insufficient to sustain the conviction of murder.

## I.

Appellant first claims that the trial court erred in denying his motion in limine and in allowing Dwayne Hendrickson to testify.

■ Appellant had filed a Motion in Limine asking the court to rule that certain proposed testimony of State's witness Dwayne Hendrickson be ruled irrelevant and immaterial and, therefore, inadmissible at trial. The court overruled this motion. Dwayne Hendrickson testified as to a conversation he had overheard in which Mitchell Waters had told his father, "You don't have to worry about the money. It's all taken care of." There was no objection made to this testimony at the time it was given. Objection was made after recess during a "clean up" motion. The court denominated it a continuing motion and overruled it. In order to preserve error in the overruling of a pre-trial motion in limine the appealing party also must have objected to the admission of the evidence at the time it was offered. *State v. Church of Nazarene of Logansport*, (1978) 268 Ind. 523, 377 N.E.2d 607; *Burrus v. Silhavy*, (1973) 155 Ind.App. 558, 293 N.E.2d 794.

Appellant's objection that the testimony was irrelevant and immaterial to the issues involved is without merit.

■ Appellant Waters had owed Larry Brown at least $15,000. He had given Brown two checks, one in the amount of $17,000 and the other in the amount of either $384 or $834. These checks were given to Brown and then taken back from him supposedly for the purpose of having Waters' wife countersign them. The checks were never countersigned. Even though Waters had written these checks, he had never had more than about $1200 in his account. The above testimony was offered in an attempt to establish a motive for the killing. It also tended to be an admission

that Waters had "taken care" of the problem of this debt. The evidence could reasonably contribute to the inference that Waters had killed Brown to avoid paying a substantial debt. Evidence having even a slight tendency to prove a material fact in issue is relevant. *Jones v. State*, (1979) Ind., 385 N.E.2d 426. There was no error in the overruling of this motion and the admission of this testimony.

## II.

Appellant next claims that the trial court erred in overruling a motion to suppress and in admitting evidence seized in a search of defendant's former residence. Mitchell Waters had rented a residence on Truitt Road, in Delaware County, from Mrs. Shroyer. He paid rent there from February 1978 to February 1979. The last rent receipt was dated January 24, 1979, and was for the rental period of January 24 to February 24. Mrs. Shroyer testified that the Waters had always paid their rent on time. When they did not pay rent in February she went to the house on March 2, to get the rent. No one was there and she could see that everything had been moved out of the kitchen and from another room that could be seen from the kitchen. On March 5, she and her husband went to Fairmont to see if they could "run them down." The Shroyers had repeatedly asked Waters to remove a large number of tires that were on the premises. Waters had promised to move them and had not done so. When the Shroyers found out that he had left, they were quite concerned. They went to Fairmont and waited for Mrs. Waters to come home. They finally saw her after midnight. She said that they would pay rent until the tires were removed. On March 9, the Shroyers wrote a letter asking that the tires be removed and told the Waters that since they had retained the keys the Shroyers would hold them responsible for rent and any damages to the property. On March 5, Mrs. Shroyer called the gas company and found out that the gas had been shut off because Waters did not pay the bill. Shroyers went in the house and plugged in an electric heater to prevent damage to the

plumbing. At that time they saw a discon-
nect notice from Indiana Michigan Electric
Company. They asked that the electricity
be put in Mr. Shroyer's name on March 10
or 11. Although there was property left in
the house and tires left around the yard,
Mrs. Waters said that they had decided,
about February 4, 1979, not to live there
any more. They had bought a house in
Fairmont and had moved part of their pos-
sessions. They had been sleeping at the
Fairmont house since February 10, and she
considered that house to be her legal resi-
dence after February 10.

Mrs. Shroyer had called the police asking
about what she could do about tenants who
had vacated her rental property and left
property inside the house and used tires
around the out buildings. She wanted to go
inside the house to check on the condition in
which it had been left by the Waters and
wanted the police to accompany her. On
March 20, the Sheriff accompanied the own-
ers to the Truitt Road house and entered
the house with the owners' key and their
consent. At this time a coat was seized
which had keys in the pocket, and a copy of
an order to stop payment on checks was
taken from a box on the floor. No search
warrant was issued prior to this search. At
this time Waters was being held in Dela-
ware County Jail on preliminary charges of
murder.

Appellant contends that because he did
not give his consent to the search, it was an
illegal search and that all items seized
should have been suppressed. Appellant
claims he had a possessory interest in the
premises based on the facts that he had
rented this property in the past, had not
returned the keys, and had left considerable
property on the premises which was not
moved immediately after their buying the
house in Fairmont. He argues that the
owner's request and consent did not vali-
date the warrantless search of the Truitt
Road house. The State contends that appel-
lant had no standing to challenge the search
since his failure to pay rent had terminated
his leasehold and that he no basis for a
legitimate expectation of privacy in that
house.

In determining whether appellant's
rights were violated when the sheriff ac-
companied the owners to the house and
items were seized, we must determine
whether Waters had a legitimate expecta-
tion of privacy in that house. *Rakas v.
Illinois*, (1978) 439 U.S. 128, 99 S.Ct. 421, 58
L.Ed.2d 387; *Pollard v. State*, (1979) Ind.,
388 N.E.2d 496. Appellant claims a kind of
possessory interest in this house. In con-
sidering his claim we note that Ind. Code
§ 32–7–1–7 (Burns 1980 Repl.) provides that
a notice to quit is not required to express a
tenant's intention to terminate his leasehold
when rent is payable in advance and such
rent is not paid. The failure of the tenant
to pay such rent constitutes a default of the
lease. *Lafayette Car Wash, Inc. v. Boes*,
(1972) 258 Ind. 498, 282 N.E.2d 837. Here
appellant had not paid his rent, had moved
and bought a house in another town. He
simply failed to remove all of his property
from his house and yard after changing his
residence. He had never contacted the
owners to notify them he was moving from
their house, instead they had had to try to
locate him. When Mrs. Waters was con-
fronted she claimed that they would pay
rent until the tires were removed. How-
ever, it is undisputed that no more rent was
ever paid after the January payment. The
trial court heard all of these facts and de-
termined that the lease had been terminat-
ed and that there was no violation of the
appellant's Fourth Amendment rights. We
agree with this determination. There was
no error in allowing these items into evi-
dence.

### III.

Appellant finally contends that the evi-
dence is insufficient to sustain his convic-
tion. He claims that some possible motive
which was inferred from the evidence is the
only connection between him and the of-
fense.

The evidence most favorable to the
State revealed that Larry Brown left Diane
Brown's home on the evening of February
1, 1977. At that time he had his keys with

him. They were on a distinctive and unique key chain. He was going to meet appellant Waters at a warehouse on Lilac Lane to collect some checks for tires. Larry Brown was never seen alive again. Over two years later, his body was found in a warehouse on Lilac Lane that had been rented by Waters. His truck and business keys were found in a pocket of Waters' coat, and stop payment orders against the checks given by Waters to Larry Brown were also found. Testimony was heard that Waters had told his father that he did not have to worry about the money, that he had taken care of it. It is clear that a conviction may be sustained upon circumstantial evidence alone. *Willard v. State*, (1980) Ind., 400 N.E.2d 151, 160; *Ruetz v. State*, (1978) 268 Ind. 42, 48–51, 373 N.E.2d 152, 156–57. The evidence here is sufficient to support the jury's finding that appellant Waters was guilty of first degree murder.

Judgment affirmed.

GIVAN, C. J., and DeBRULER and HUNTER, JJ., concur.

PRENTICE, J., concurs in result.