

**FILED**

Aug 24 2016, 8:17 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott L. Barnhart
Brooke Smith
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Christopher Compton,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 24, 2016

Court of Appeals Case No.
82A01-1511-CR-1997

Appeal from the Vanderburgh
Superior Court

The Honorable Robert J. Pigman,
Judge

Trial Court Cause No.
82D02-1403-MR-355

**Robb, Judge.**

# Case Summary and Issues

[1] Following a trifurcated jury trial, Christopher Compton was convicted of three counts of felony murder and found to be an habitual offender. Compton appeals, raising two restated issues: (1) whether Compton was deprived of due process when the trial court allowed the media to Tweet live updates of his trial from the courtroom, and (2) whether the trial court abused its discretion in admitting evidence of Compton's incriminatory statements. Concluding the trial court did not deprive Compton of due process nor did it err in admitting evidence of Compton's statements, we affirm.

# Facts and Procedural History

[2] In March 2014, Keri Jones, along with her two twin three-year-old daughters, lived in a second-floor apartment in Evansville with several family members and friends. Compton and Jones had been dating on and off for a few years, but Compton did not live in the apartment. On the afternoon of March 17, 2014, Compton visited the apartment. Compton and Jones were both intoxicated and the pair began arguing. After the argument, Compton stated, "Something is going to happen real soon." Transcript at 817. Not long thereafter, Compton and Jones began arguing again, with Compton threatening, "[I]f you don't leave with me, if you and the babies don't leave with me now, I'm going to burn this mother f***er to the ground . . . ." *Id.* at 964. Jones's uncle, the owner of the apartment, then ordered Compton to leave. A few minutes later, the occupants of the apartment smelled smoke,

observed flames coming from the stairwell, and attempted to escape through the apartment's second-floor windows. Jones, one of Jones's daughters, and another occupant were unable to escape and died from smoke inhalation and/or carbon monoxide poisoning.

[3] Meanwhile, a neighbor, Earl Iverson, observed Compton walking away from the apartment and explained to Compton smoke was coming from the apartment. Compton replied, "I know, I started it." *Id*. at 570, 618. Iverson immediately walked towards the apartment and told responding police officers Compton admitted to starting the fire. Police officer William Arbaugh identified Compton outside a nearby liquor store. After Compton made incriminating statements,[1] police officers advised Compton of his *Miranda* rights. Thereafter, Compton explained, "I flicked the Mild, I mean that Black and Mild, (inaudible) went in there, I have no clue. . . . I know I flicked the, I flicked the fire (inaudible) lighting my Black and Mild (inaudible)." *Id*. at 593. Compton was arrested. During an interview with Detective Keith Whitler, Compton stated the fire started when he flicked a cigar onto some clothing resting on a baby stroller near the stairwell.

---

[1] We note the conversation between Compton and police officers was captured on Officer Arbaugh's body camera, which the State admitted into evidence and played for the jury. After Officer Arbaugh asked Compton his name, Compton stated, "I just flicked the fire, I just flicked the fire onto the umm, onto the umm. . . . I flicked it umm—I ain't going to lie. I flicked on a (inaudible) umm baby stroller, that was it." Tr. at 590. A police officer responded, "You flicked a spark on a baby stroller?" *Id*. Compton provided an inaudible answer.

[4]     The State charged Compton with three counts of felony murder, fourteen counts of Class A felony arson, and alleged Compton was an habitual offender. Prior to trial, Compton filed a motion to exclude evidence of the inculpatory statements he made to Iverson, police officers, and Detective Whitler, alleging the State failed to establish the *corpus delicti* of arson. Specifically, Compton argued there was no evidence an arson occurred apart from his inculpatory statements. At a hearing on the motion, fire investigator Jennifer Hunt testified the fire originated at the bottom of the stairwell. She did not find any evidence of accelerants nor was she able to determine the source of the fire. Hunt ruled out all potential natural and accidental causes of the fire, but could not rule out the possibility the fire was intentionally set. Ultimately, Hunt concluded the cause of the fire was undetermined.[2] The State also introduced evidence to establish a timeline of Compton's whereabouts before and during the fire. After taking the matter under advisement, the trial court denied Compton's motion.

[5]     Prior to trial, the trial court instructed the jury not to use the internet to gather information about the case and not to read, watch, or listen to any source discussing the trial, including newspapers, radio, television, and the internet. During trial, but outside the presence of the jury, a reporter approached the trial court and asked whether the media could give live updates of the trial via the

---

[2] Hunt reiterated her conclusions at trial.

social media application, Twitter. Compton objected and the trial court overruled his objection, noting,

> I'm going to—I am going to instruct the parties to tell their witnesses to turn off their Twitter accounts until after they've testified. . . . But I am going to allow those of you in the media that are here that are Tweeting, I think that's what it's called, you're going to be permitted to do that so long as it's done in a way that doesn't interfere with the proceedings.

*Id*. at 553. Also during trial, the State sought to admit evidence of Compton's inculpatory statements. Compton renewed his objection on the basis the State failed to establish the *corpus delicti* of arson, which the trial court overruled. The jury found Compton guilty but mentally ill on all three counts of felony murder and further found Compton to be an habitual offender.[3] This appeal ensued.

## Discussion and Decision

## I. Use of Twitter

[6] Compton contends the trial court violated Rule 2.17 of the Code of Judicial Conduct in allowing the media to Tweet live updates of his trial from the courtroom, arguing Tweeting live updates of his criminal trial amounts to

---

[3] The State dismissed the arson charges against Compton.

inherently prejudicial "broadcasting" that violates his right to due process.[4] The State counters Tweeting does not amount to broadcasting, and even if so, Compton has not demonstrated he suffered any prejudice.[5] Because broadcasting a defendant's trial is not inherently prejudicial and Compton has not demonstrated he suffered prejudice as a result of the alleged broadcasting, we need not address whether Tweeting live updates of a criminal trial is deemed "broadcasting."

[7] At the outset, we note the First Amendment to the United States Constitution guarantees freedom of the press and the Sixth Amendment guarantees a public trial by an impartial jury. U.S. CONST. amends. I and VI. A public criminal trial ensures the proceedings are fair because it allows members of the public to observe proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580-81 (1980). "The requirements of a public trial are satisfied by the opportunity for both the public and the press not only to attend the trial but to report what they observe." *Van Orden v. State*, 469 N.E.2d 1153, 1157 (Ind. 1984) (referencing *Nixon v. Warner Comm., Inc.*, 435 U.S. 589 (1978)), *cert. denied*, 471 U.S. 1104 (1985). In addition, "the right to attend criminal trials is

---

[4] Rule 2.17 provides, in relevant part, "Except with prior approval of the Indiana Supreme Court, a judge shall prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions . . . ."

[5] The State also argues Compton waived this argument by not moving for a mistrial or requesting an admonishment. We disagree. A request for an admonishment or mistrial was unnecessary because all discussions about Twitter, up until that point, had been outside the jury's presence. Compton contemporaneously objected to allowing the media to use Twitter thereby preserving the issue for appeal.

implicit in the guarantees of the First Amendment." *Richmond Newspapers, Inc.*, 448 U.S. at 580 (footnote omitted).

[8] In *Estes v. Texas*, 381 U.S. 532 (1965), the trial court denied Estes's motion to bar the broadcasting of his trial by television, radio, and photography. Estes argued broadcasting a criminal trial is inherently prejudicial and therefore broadcasting a trial deprives a defendant of due process. Writing for the Court, Justice Clark agreed with Estes, noting,

> [T]his Court itself has found instances in which a showing of actual prejudice is not a prerequisite to reversal. This is such a case. It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that is deemed inherently lacking in due process.

*Id.* at 542-43. Four justices concurred, including Justice Harlan who filed a limited concurring opinion. Justice Harlan agreed reversal was necessary but he could not agree broadcasting criminal trials inherently deprived defendants of a fair trial. *See id.* at 590-91 (Harlan, J., concurring). Dissenting, Justice Brennan wrote,

> I write merely to emphasize that only four of the five Justices voting to reverse rest on the proposition that televised criminal trials are constitutionally infirm, whatever the circumstances. Although the opinion announced by my Brother CLARK purports to be an "opinion of the Court," my Brother HARLAN subscribes to a significantly less sweeping proposition. . . . Thus

today's decision is *not* a blanket constitutional prohibition against the televising of state criminal trials.

*Id*. at 617 (Brennan, J., dissenting).

In *Willard v. State*, 272 Ind. 589, 400 N.E.2d 151 (1980), the State charged Willard with, *inter alia*, murder. Over Willard's objection, the trial court permitted live video taping of the trial and further allowed the tapes to be disseminated to the media. As the trial progressed, the Indiana Commission on Judicial Qualifications discovered Willard's trial was being videotaped and disseminated to the media. In response, the Commission notified the trial court it was violating the Code of Judicial Conduct by broadcasting and/or recording courtroom proceedings. After Willard became aware of the Commission's concerns, he moved for a mistrial, which the trial court denied.

Before our supreme court, Willard relied on *Estes*, arguing the broadcasting of his trial was inherently prejudicial. Upon examining *Estes*, the court concluded *Estes* did not stand for the proposition televised criminal trials are inherently prejudicial; rather, such determinations "must be made on a case by case basis."[6] *Id*. at 599. In addressing the merits of Willard's claim, the court noted the trial court did violate the Code of Judicial Conduct in broadcasting the trial, but that fact alone did not require a reversal. *Id*. Rather, because of the

---

[6] For this reason, we reject Compton's argument that the act of Tweeting live updates of his criminal trial, if considered broadcasting, is inherently prejudicial.

overwhelming evidence supporting Willard's conviction, the lack of evidence indicating a "carnival atmosphere" surrounding the trial, and the fact the jury was sequestered and not made aware of the recordings, the court concluded the broadcasting of Willard's criminal trial did violate due process. *Id.* at 599-600.

[11] As noted above, it is unnecessary to decide whether Twitter is "broadcasting," because even assuming it is, broadcasting is not inherently prejudicial and Compton has shown no specific prejudice to him in this case.[7] Similar to *Willard*, the evidence against Compton, including his inculpatory statements, is overwhelming, *see infra* Part II.B; prior to trial, the trial court instructed the jury not to receive information about the case from any source, including internet

---

[7] Despite our ultimate conclusion, we take this opportunity to express our concern as to the impact social media applications have on due process and trials. Social media applications, such as Twitter, allow users to disseminate information immediately from their portable devices, similar to live television and radio broadcasts. The use of Twitter has already created multiple issues surrounding whether such use may compromise a defendant's due process rights. *See generally* Jamie K. Winnick, *A Tweet is(n't) Worth a Thousand Words: The Dangers of Journalist's Use of Twitter to Send News Updates from the Courtroom*, 64 Syracuse L. Rev. 335 (2014). For example, jurors and prosecutors have utilized Twitter during criminal trials. *See Dimas-Martinez v. State*, 385 S.W.3d 238, 242 (Ark. 2011) ("[A] second juror was posting on his Twitter account during the case, and continued to do so even after being questioned by the circuit court, [which was] evidence of juror misconduct that calls into question the fairness of his trial.") (footnote omitted); *State v. Polk*, 415 S.W.3d 692, 696 (Mo. Ct. App. 2013) (noting how troubling it was that a state prosecutor, who was not involved in the defendant's case, tweeted live updates of the defendant's criminal trial and such conduct "greatly magnified the risk that a jury will be tainted by undue extrajudicial influences"). There are also concerns potential witnesses may see information tweeted about other witnesses' testimonies despite a trial court's separation of witnesses order, a concern shared by Compton. *See* Winnick, *supra*, at 347-48. Despite these concerns, we decline to opine whether the use of Twitter should be permitted in the courtroom.

We note, however, the pretrial instructions in this case did not instruct the jury not to refrain from seeking information through social media applications. Rather, the instructions merely instructed the jurors not to receive information from the internet. Given how easily one may access the internet in this technological age, we fear such an instruction may not be specific enough to deter jurors from using Twitter now and in the future. In addition, we note when the ethics rules regarding "broadcasting" were written, social media was a vastly different medium than today. We believe judges and attorneys are in need of guidance on how they approach the use of social media during criminal trials. Therefore, given the rapidly evolving relationship between Twitter and our judicial system, we believe it is time for all appropriate judicial, attorney, and ethics committees to come together to specifically address these concerns.

sources; the jury was sequestered during the Twitter discussion; the trial court instructed the media not to Tweet in a manner that would disrupt proceedings; the trial court instructed the attorneys to notify their respective witnesses not to use Twitter until after they testified; and there is no evidence any witnesses or jurors viewed any Tweets pertaining to the trial.[8] We conclude Compton was not deprived of due process when the media was allowed to Tweet live updates of his criminal trial from the courtroom.

## II. Admission of Evidence

### A. Standard of Review

[12] The admissibility of evidence is within the sound discretion of the trial court. *Cherry v. State*, 971 N.E.2d 726, 730 (Ind. Ct. App. 2012), *trans. denied*. A trial court may abuse its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.*

### B. Corpus Delicti

[13] Compton contends the trial court abused its discretion in admitting his inculpatory statements, arguing the State failed to present evidence outside of

---

[8] At trial, Compton argued allowing the media to Tweet live updates of the trial would infringe upon the trial court's separation of witnesses order. To the extent Compton is raising a violation of the separation of witnesses order on appeal, his argument fails. *See Morell v. State*, 933 N.E.2d 484, 490-91 (Ind. Ct. App. 2010) (stating with respect to separation of witnesses, "where there is no affirmative evidence introduced that the witnesses had in fact discussed their testimony there is no reviewable question").

his confessions sufficient to establish the *corpus delicti* for arson. Specifically, he argues there is no evidence—apart from the inculpatory statements he made to Iverson, police officers, and Detective Whitler—establishing an arson occurred.

> A crime may not be proven solely on the basis of a confession. There must be some other proof of the crime, in order to prevent confessions to crimes which never occurred. In Indiana, to support the introduction of a defendant's confession into evidence, the corpus delicti of the crime must be established by independent evidence of (1) the occurrence of the specific kind of injury and (2) someone's criminal act as the cause of the injury. [T]he independent evidence need not be shown beyond a reasonable doubt; rather, the evidence need only provide an *inference* that a crime was committed. Such inference may be established through circumstantial evidence.

*Sweeney v. State*, 704 N.E.2d 86, 111-12 (Ind. 1998) (alteration in original) (citations and internal quotation marks omitted), *cert. denied*, 527 U.S. 1035 (1999); *see also Cherry*, 971 N.E.2d at 730 ("Proof of the *corpus delicti* means proof that the specific crime charged has actually been committed by someone.") (citation omitted).

[14]  At the outset, we acknowledge Hunt did not find any accelerants nor evidence the fire was set intentionally. However, she ruled out all possible natural and accidental causes to the fire, and as a result, she could not rule out the possibility the fire was set intentionally. *See generally Fox v. State*, 179 Ind. App. 267, 277, 384 N.E.2d 1159, 1167 (1979) ("[T]here is rarely direct evidence of the actual lighting of a fire by an arsonist; rather, the evidence of arson is usually circumstantial. Such evidence is often of a negative character; that is,

the criminal agency is shown by the absence of circumstances, conditions, and surroundings indicating that the fire resulted from an accidental cause.") (citation omitted). The evidence establishes Compton was present at the apartment prior to the fire. While at the apartment, Compton stated, "Something is going to happen real soon[,]" tr. at 817, and threatened Jones by stating, "if you don't leave with me, if you and the babies don't leave with me now, I'm going to burn this mother f***er to the ground[,]" *id*. at 964. Shortly thereafter, the apartment caught fire and Compton was observed walking away from the apartment. The victims died as a result of smoke inhalation and/or carbon monoxide poisoning. The evidence independent of Compton's inculpatory statements provides an inference an arson was committed. *See Sweeney*, 704 N.E.2d at 111-12. We therefore conclude the *corpus delicti* for arson was sufficiently established and the trial court did not err in admitting evidence of Compton's inculpatory statements.

# Conclusion

[15] Compton cannot demonstrate he suffered prejudice as a result of the alleged broadcasting of his criminal trial and we therefore conclude Compton was not deprived of due process. We further conclude the trial court did not err in admitting evidence of Compton's inculpatory statements. Accordingly, we affirm.

[16] Affirmed.

Najam, J., and Crone, J., concur.