Keith B. CANAAN, Appellant (Defendant below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 82S00–8705–CR–521.

Supreme Court of Indiana.

July 28, 1989.

Barry L. Standley and Beverly K. Harris, Evansville, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–Appellant Keith Canaan was charged with Murder, a Class A felony, Burglary, a Class B felony, and Criminal Deviate Conduct, a Class A felony. He was convicted of Murder, Burglary, and Attempted Criminal Deviate Conduct. He was also determined to be an Habitual Offender, which would enhance a sentence by an additional thirty (30) years. However, Canaan was not sentenced to a term of years but was sentenced to death.

Canaan appeals directly to this Court and raises numerous issues which we consolidate and restate as follows:

1. whether the Indiana capital sentencing scheme is unconstitutional because the jury makes a recommendation as to whether the death penalty should be imposed;

2. whether the State's charging Canaan with being an habitual criminal and simultaneously seeking the death penalty violates his double jeopardy and 8th Amendment rights;

3. whether the trial court abused its discretion in admitting a pack of "Kool" brand cigarettes into evidence;

4. trial court error in admitting certain fingerprint evidence;

5. trial court error in excluding certain statements Canaan made to police officers;

6. trial court error in refusing to grant a directed verdict due to insufficient evidence;

7. trial court error in denying a motion for mistrial due to improper remarks made during final argument;

8. trial court error in giving an instruction on attempted criminal deviate conduct; and

9. trial court error in refusing to give certain tendered instructions.

The facts most favorable to the verdict show that on December 29, 1985, at approximately 2:45 a.m., patrolman William Barnes received a dispatch and went to 4982 Fairmont in Evansville, Indiana. The address was located in an apartment building, and the building laundry room interior and exterior doors were open. The apartment itself looked as though it had been ransacked. Barnes proceeded to an end bedroom; the door to the bedroom had been kicked in. The victim, Lori Bullock, lay on one of the beds. Barnes checked Bullock's pulse, and found she was dead. A butcher knife protruded from the right side of her throat. Barnes called his supervisor and secured the area.

Members of the Crime Scene Technical Unit arrived in the early hours of that morning. Over a three day period evidence was gathered. Some evidence was found outside the apartment, including articles of clothing, a towel, and food items. The apartment was dusted for fingerprints. In addition, Officer Barnes tested the door to the apartment and found that even when the door was locked with the deadbolt lock, a good shove would pop it open. Bullock's roommates testified that once the door, even when latched but unlocked, blew open. This happened when the outer hallway door was opened, and a gust of air came through to force the apartment door open. Also found on the stairway, in a common area, was a pack of "Kool" cigarettes with saliva under it. On January 4, 1986, a number of jewelry items were recovered in the nearby Eastland Mall. They belonged to one of Lori Bullock's roommates.

Keith Canaan was arrested two days after the crime occurred. At the time of his arrest, officers recovered a duffel bag, clothing, a comb, a package of "Kool" cigarettes, some money, a billfold and a wristwatch.

One to two weeks prior to Bullock's death, Canaan had been in her apartment. Bullock and two of her roommates, Chris Hillsmyer and Linda Rush, were at home. Bullock however was asleep in a back bedroom and she and Canaan never saw each other. Canaan had knocked on the door and stated he was looking for the girls upstairs. Hillsmyer told him he could wait for them, and Canaan sat on the couch by the door. He had a case of beer with him, showed the roommates his tattoos, and fell asleep on the couch. Hillsmyer eventually got him to leave, but he returned the next morning and asked to use the phone. Although Hillsmyer initially refused, a fourth roommate, Jean Traver, thought she knew Canaan and let him in. Traver allowed him to use the phone. She stated at trial that Canaan never touched anything in the kitchen area.

The day Bullock was killed, she and Hillsmyer had gone shopping at the Eastland Mall. Bullock counted her money after returning home; she had approximately $200 in her wallet. Then Bullock and Hillsmyer went to the Executive Inn. Bullock loaned Hillsmyer her car for the evening and went home early because she had to work the next morning. Hillsmyer called Bullock at approximately 9:00 that evening to see whether Bullock needed her car; she said she did not.

Ricky Bathe, Bullock's boyfriend, went to see her after she had returned from shopping. He left Bullock at approximately 8:30 p.m. that evening. He telephoned her three separate times starting at 11:00 p.m., but no one answered the phone.

Keith Canaan and his brother Kevin were seen drinking beer at a Chi Chi's Mexican restaurant earlier in the day. Kevin testified at trial that Keith had only about five dollars with him. After Kevin left at about 10:00 p.m., Keith was seen trying to sell his red ten-speed bicycle to employees of Chi Chi's in the parking lot.

At approximately 10:40 p.m., Natasha Clark, an upstairs neighbor of Bullock's, heard a knock at her door. The person at

the door, later identified as Canaan, asked if she knew when the girls across the hall would be at home. He then leaned in the doorway and asked if she was having a party. Mrs. Clark closed the door. Clark did have company and remarked to those present that "Norman Bates' brother is outside the door." She explained at trial that she used the phrase because he looked strange, was nervous, fidgeted with his cigarette package, and "had a strange look." The second time he knocked, Matt Clark went to the door, and the person offered to sell his bicycle for $30. Clark refused. Canaan then said, "Just shut the damn door." The Clarks and a number of their guests testified Canaan knocked on the door across the hall and then proceeded to the first floor, where he was heard to knock on another door. Lori Bullock's apartment was located on the first floor. It was approximately 10:45 p.m. when Canaan went downstairs.

Later that evening, Canaan was seen at Bennigan's, a restaurant located near the Eastland Mall. The time indicated on his bill was 12:45 a.m., and he had been there for approximately thirty-five to forty-five minutes before getting the bill. Still later in the evening Canaan met Kirk Pfeiffer, and the two went to a bar called the Silver Dollar. On the drive back, Canaan offered Pfeiffer gas money. He counted his money off in twenties and had at least $100.

At approximately 4:00 a.m. Canaan was seen at Jerry's Restaurant in Evansville. Canaan asked a waitress, Charlotte Stoner, how he could remove some blood stains from his shirt. Canaan led her to believe the blood was from a previous injury. A few days before, Canaan had come into the same restaurant, his hands cut and bleeding. Stoner testified, however, that he was not wearing the same grey shirt on the previous occasion.

Finally, Keith and Kevin Canaan's friend, Mark Gilmore, testified that on the afternoon of December 29, 1985 both Canaan brothers were at his home. The brothers noticed policemen standing outside Kevin's nearby apartment. They showed signs of nervousness and began talking in whis-

pers. Gilmore did hear Keith tell Kevin to get rid of some of his pants and say a number of times, "I've got to get out of here." Kevin later testified at trial that Keith told him he had killed a "biker" at the Silver Dollar bar the night before. Police records indicate, and an employee of the bar testified, no one was killed there that night.

I

■ The first issue presented on appeal is whether IC 35–50–2–9, which provides for the jury to make a recommendation to the sentencing judge, leaving to the trial judge the option to follow or not follow the recommendation, is an unconstitutional violation of Canaan's due process rights. Canaan claims the language of § 9(e): one, places the jury, in a fact-finding situation, in an advisory role, which is contrary to the constitutional mandates of due process; and two, diminishes the impact and importance of jury fact-finding because the jury knows it does not make the final decision of whether the defendant lives or dies. Canaan gives little if any authority for his position and claims this is an issue of first impression in all state and federal systems, including Indiana's. To the contrary, the United States Supreme Court has discussed and approved capital sentencing statutes which are nearly identical to Indiana's statutory scheme.

The United States Supreme Court reviewed and approved three different but very similar methods of the use of the decision by the jury and the trial judge in imposing the death penalty. In *Proffitt v. Florida* (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, *reh. denied* (1976), 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158, the Court reviewed and approved Florida's statutory scheme. Indiana's statute is fashioned after the provisions of the Florida statutes. Those statutes provide that following a finding of guilty of first degree murder, a separate presentence hearing is held and the jury considers eight aggravating and seven mitigating circumstances specified in the statutes and returns an advisory verdict as to the sentence. The trial judge

determines the actual sentence; he also weighs the statutory aggravating and mitigating circumstances. If he imposes a death sentence, the judge must set forth in writing his fact findings which state sufficient statutory aggravating circumstances exist and are not outweighed by statutory mitigating circumstances. A death sentence is also automatically reviewed by the Supreme Court of Florida. In *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, *reh. denied* (1976), 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158, the United States Supreme Court approved Georgia's scheme which provided the presentence hearing following a determination of guilt is conducted either before a judge or jury which hears mitigating and aggravating evidence. They must find at least one of ten specified aggravating circumstances exists beyond a reasonable doubt and must so designate this in writing. The judge makes this determination if it is tried before the court and the jury makes the determination if tried before a jury, and here the judge is bound by the jury's recommended sentence. The Supreme Court of Georgia automatically reviews a death sentence.

In *Jurek v. Texas* (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, *reh. denied* (1976), 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158, the Supreme Court approved the Texas system which enumerates five specific aggravating circumstances, one of which must exist in order to impose the death penalty. The presentence hearing is held before the jury, which, in addition to finding at least one aggravating circumstance existed, must also answer specific questions: 1) whether the defendant's conduct which caused the death was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; 2) whether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and 3) if raised by the evidence, whether the defendant's conduct in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. If the jury finds the State has proved beyond a reasonable doubt the answer to each of these questions is yes, the death sentence is imposed. If the jury finds the answer to any of the questions is no, a sentence of life imprisonment results. Death sentences are given expedited review on appeal. Hence, the jury in the Texas scheme must find certain facts exist and upon an affirmative finding on all of the required facts, a judgment is entered imposing the death penalty.

In *Proffitt*, the Supreme Court recognized the difference between the Florida and Georgia schemes:

> The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This Court has pointed out that the jury sentencing in a capital case can perform an important societal function, *Witherspoon v. Illinois*, 391 U.S. 510, 519 n. 15 [88 S.Ct. 1770, 1775 n. 15, 20 L.Ed.2d 776] (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.
>
> The Florida capital-sentencing procedures thus seek to assure that the death penalty will not be imposed in an arbitrary or capricious manner. Moreover, to the extent that any risk to the contrary exists, it is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida "to determine independently whether the imposition of the ultimate penalty is warranted." *Songer v. State*, 322 So.2d 481, 484 ([Fla.] 1975). See also *Sullivan v. State*, 303 So.2d 632, 637 ([Fla.] 1974).

*Proffitt*, 428 U.S. at 252–53, 96 S.Ct. at 2966–67, 49 L.Ed.2d at 922–23 (footnotes omitted). The *Proffitt* Court further concluded:

The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.

*Id.* at 258, 96 S.Ct. at 2969, 49 L.Ed.2d at 926.

In 1985, the United States Supreme Court was presented the issue of a jury taking its responsibility lightly in imposing the death penalty where the prosecuting attorney, in his final argument, encouraged the jury to do so. *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231. In a bifurcated proceeding, Caldwell's lawyers, in their closing argument at the sentencing stage, referred to petitioner's youth, family background, and poverty, as well as to general character evidence. They asked the jury to show mercy, emphasizing that the jury should confront the gravity and responsibility of calling for another's death. In response, the prosecutor urged the jury not to view itself as finally determining whether petitioner would die because a death sentence would be reviewed for correctness by the Mississippi Supreme Court. An evenly divided Mississippi Supreme Court affirmed the conviction and the imposition of the death penalty. The United States Supreme Court found that the imposition of the death sentence was a violation of the Eighth Amendment of the United States Constitution and held it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe the responsibility for determining the appropriateness of the defendant's death rests elsewhere. The Court stated:

The "delegation" of sentencing responsibility that the prosecutor here encouraged would thus not simply postpone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for

an appellate court, unlike a sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance.

*Id.* at 330, 105 S.Ct. at 2640, 86 L.Ed.2d at 240. The Court found the uncorrected suggestion that the jury's responsibility for any ultimate determination of death will rest with others presented the danger the jury might choose to minimize the importance of its role.

Clearly, the Supreme Court in *Caldwell* did not find that the nature of the jury's advisory responsibility violated the Eighth Amendment to the Constitution. Rather, it found the State's conduct invited the jury to take its responsibility lightly since its judgment would not be final anyway. Canaan does not contend, and there is no showing here, there was even an inference of any improper conduct or influence exerted on the jury which would give rise to a finding that they did not properly and sincerely impose the death penalty in this case. The trial court made written findings that the State had proven beyond a reasonable doubt the existence of aggravating circumstances which outweighed any mitigating circumstances and therefore justified the imposition of the death penalty.

In *Spaziano v. Florida* (1984), 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340, the United States Supreme Court reviewed a case in which the jury recommended life imprisonment and the trial judge instead sentenced Spaziano to death. In reviewing Florida's statutory scheme, which, like Indiana's, permits this, the Supreme Court found that if the legislature can allow a judge to determine a capital issue uncounseled by a jury, there is no bar to allowing a judge to determine the issue with the benefit of the jury which can still function, among other things, as the voice of the community. "If a judge may be vested with sole responsibility for imposing the [death] penalty, then there is nothing constitutionally wrong with the judge's exercising that responsibility after receiving the advice of the jury." *Id.* at 465, 104 S.Ct. at 3165, 82 L.Ed.2d at 356.

Canaan presents no reversible error on this issue.

## II

■ The second issue which we address is whether Canaan's double jeopardy rights were violated when he was charged with being an habitual offender at the same time the State sought the death penalty against him. Canaan also claims his Eighth Amendment right against cruel and unusual punishment was violated, but he does not cite authority or argue this claim. Therefore, we need not address that issue here. *Wagner v. State* (1985), Ind., 474 N.E.2d 476, 486.

■ The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."

> The Clause has been held to embody three separate but related prohibitions: (1) a rule which bars a reprosecution for the same offense after acquittal; (2) a rule barring reprosecution for the same offense after conviction, and; (3) a rule barring multiple punishment for the same offense. *North Carolina v. Pearce*, (1969) 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656. The rules barring reprosecution and multiple punishment are related in that a defendant may not be reprosecuted in a second trial for the *same offense* nor may he be twice sentenced for the *same offense* in a single proceeding.

*Elmore v. State* (1978), 269 Ind. 532, 534, 382 N.E.2d 893, 894.

Canaan bases his challenge on the third prohibition, that of multiple punishments for the same offense. He points out that both the death penalty and habitual offender determination are sentence enhancements, and claims that he cannot be faced with two sentence enhancements for the same crime.

Double jeopardy rights protect a defendant from multiple *punishments*. The death penalty and habitual offender determination are *enhancements* and do not, therefore, constitute cumulative punishment. Enhancement for habitual criminal is based on facts different from those supporting imposition of the death penalty. In addition, practically speaking, there is no way Canaan could be sentenced as an habitual offender (to a term of years) and be given the death penalty. Indeed, although he was found to be an habitual offender, he was not sentenced on that. The situation was not, as Canaan argues, that the State could not decide which penalty was most appropriate; rather, the State was of the opinion that if the death penalty were reversed on appeal or not found appropriate by the jury, he would receive an enhanced sentence for having committed this heinous crime after having been convicted several previous times for felonies. There is no error presented here.

## III

We next address Canaan's contention the trial court erred in admitting a pack of "Kool" cigarettes, a slide showing the pack as it was found, and saliva found underneath it, into evidence. Canaan claims the exhibits were irrelevant, and the prejudice to him far outweighed their probative value.

The cigarette package and saliva were found on the stairway leading from the first floor of the building, where Bullock's apartment was located, to the second floor, where the Clarks' apartment was located. Several people used the stairway the evening Bullock was killed. At trial one witness, Randy Dunn, testified he saw the package and saliva after leaving the Clark's party at approximately 12:30 a.m.

Evidence presented at trial showed that the saliva came from a type A secretor. A type A secretor is one whose saliva and other body fluids contain a water-soluble form of antigens of the A blood group found in erythrocytes, or mature red blood cells. STEDMAN'S MEDICAL DICTIONARY 1266, 482 (4th ed. 1976). Two cigarettes left burning in the apartment the night of the murder were determined to have on them the saliva of a type A secretor. Canaan was determined through testing to be a

type A secretor. According to testimony, 32% of the general population share this characteristic.

■■■ Evidence is relevant if, in light of general experience, it logically tends to prove or disprove some issue of fact. *Engle v. State* (1987), Ind., 506 N.E.2d 3, 5. It is well-settled that the trial court is accorded wide latitude in ruling on the relevancy of evidence to determine its probative value *vis a vis* its prejudicial impact. Even where evidence is only marginally relevant, it is within the trial court's sound discretion to determine its admissibility. *Wallace v. State* (1985), Ind., 486 N.E.2d 445, 460, *cert. denied* (1986), 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723. We agree with the trial court that this was evidence for the jury to consider. Canaan was found to be a type A secretor, testimony indicated that while at the Clarks' door Canaan fidgeted with a cigarette package, and when arrested, Canaan was carrying a couple of packs of "Kool" cigarettes. This evidence tends to show Canaan was not only in the apartment building, but in Bullock's apartment. It also tended to corroborate the other testimony of other witnesses placing him at the scene. We find no error here.

## IV

Canaan claims he was denied due process when the trial court admitted certain fingerprint lifts into evidence. He attacks the foundation and chain of custody of the evidence and claims it may have been tampered with or falsified. A large number of personal items, including foodstuffs, were found immediately outside Bullock's apartment building and were identified as having come from the apartment Bullock and her roommates occupied. A large number of latent fingerprints were lifted and checked, including prints from the foodstuffs found outside the apartment. Officer Ford testified he and another officer removed all of the foodstuffs and took them to the police lab where they were dusted for prints. Among the items were packages of frozen meat which had thawed and dripped blood over the other items, including a box of Red Cross spaghetti

noodles. Officer Ford testified he was able to lift a set of fingerprints from a dry portion of the spaghetti box. These were later identified as Canaan's fingerprints.

The officer testified how he transferred the lifted prints to a card. Latent fingerprints are made from oils present on the skin. They are invisible until "dusted" with a powder or some substance which adheres to the oil in the shape of the ridges of skin on the fingers of the person who left the print. The pattern of dust is lifted by placing a clear transparent tape on the dust and oil, which are removed from the surface because they are stuck to the adhesive surface of the tape. The tape is then sealed against the card, "sticky side" (the side the print is on) down. The officer further testified that once the sticky side of the lift is applied to the card, the adhesive cannot be removed without pulling the paper off the surface of the card. The officer testified that an examination of the latent print card showed there had been no such pulling off. The significance of this testimony is that the fingerprint was stuck to the card exactly as it had been originally and could not have been tampered with.

■■■ Canaan admits the mere possibility of tampering will not render evidence inadmissible. In the case of non-fungible goods, it is sufficient if the chain of custody strongly suggests the whereabouts of the exhibit at all times. Additionally, not all evidence is subject to the chain of custody rule. If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court has broad discretion in determining whether to admit it merely upon the basis of testimony the item is the one in question and is in a substantially unchanged condition. *Dier v. State* (1982), Ind., 442 N.E.2d 1043, 1046. The question then is one of credibility and not of admissibility.

■■■ In *Dier*, officers found a visible print on a doorknob and took a photograph of the doorknob; the photograph showed the visible print. Evidence was then submitted demonstrating a lifting of the print

in the same manner described in the instant case. Canaan's primary complaint is that no photograph was taken of the spaghetti box and it was subsequently discarded by the police. The evidence showed the spaghetti box appeared in a group photograph of many of the items. However, the box had been soaked by juices from the thawed meat products and the officer testified it would have been impossible to keep the box because it would have rotted and decayed. There is no evidence a photograph of the carton would have revealed a visible print on the dry portion used by the police officers to lift Canaan's print. In fact, the officer testified the print would have been invisible until dusted and lifted in the manner described above. The testimony revealed that once the print was lifted on the card it was possible to read the print and compare it with other prints known to be Canaan's. The testimony further showed the police kept this print card in the manner prescribed for keeping exhibits for production into evidence. There is no evidence it was tampered with or changed in any manner. As we have stated, this affected the credibility of the exhibit and not its admissibility. We therefore find no error in its admission into evidence.

## V

Canaan claims the trial court erred in refusing to admit testimony of a police officer on cross-examination regarding an exculpatory part of a statement he had made to police. Officer Donald Erk testified generally as to steps he and other officers took to try to locate Canaan when he became a suspect in Bullock's murder. Canaan was arrested and Officer Erk spoke to him briefly at the police station. Erk testified he and another officer talked to Canaan with a third officer present, advised him of his rights, and Canaan signed an advisement waiver. That was the extent of Officer Erk's testimony on direct examination. Defense counsel then asked Officer Erk: "After that Mr. Canaan was asked what he was doing on the Saturday night in question, the 28th of December, was he not?" The court sustained the State's objection to this question.

■ Although Canaan claims the court admitted certain parts of Canaan's statement and he was excluded from having the remainder admitted, there is nothing in the record to substantiate this claim. As we have stated, the only evidence of the conversation was Erk's testimony he had advised Canaan of his rights and Canaan had signed an advisement waiver. The State did not introduce evidence that a statement was subsequently taken; it was Canaan who attempted to admit the statement. In the statement Canaan told where he had been the night of the crime, who he was with, and gave the time of his activities, excluding any possibility he was present at the scene of the crime. Clearly the statements Canaan made amounted to hearsay. They were not subject to cross-examination since he did not testify at trial. Under such circumstances it was proper for the trial court to exclude it. *Shelton v. State* (1986), Ind., 490 N.E.2d 738, 743; *Marts v. State* (1982), Ind., 432 N.E.2d 18, 24. In *Marts,* Justice Prentice, writing for a unanimous court, reasoned: "An obvious reason for the rule is that a litigant should not be permitted to enhance his credibility by such method." *Marts,* 432 N.E.2d at 24.

■ Defense counsel then claimed the officer's notes from this conversation were filed in the record of the cause and therefore these notes were admissible pursuant to the business records exception. There is no merit to this contention. The police officer's notes do not change their character with regard to admissibility merely because they are filed in the police records. The trial court properly excluded this testimony.

## VI

Canaan contends the evidence presented at trial was insufficient to establish a prima facie case of murder. He challenges the court's failure to grant his motion for a directed verdict at the end of the State's case. He argues that because much of the evidence was circumstantial, he was erroneously convicted.

Canaan, in organizing his argument, raises a number of issues under one heading regarding the directed verdict motion. Later he addresses as a separate issue the sufficiency of the evidence. Because the determination on the issue of directed verdict and sufficiency will rest on the same facts and be tested by the same standards, we will address both sets of issues here.

Canaan concedes that a criminal conviction may be based solely on circumstantial evidence. *Willard v. State* (1980), 272 Ind. 589, 602–03, 400 N.E.2d 151, 160. On appellate review we need not find the circumstantial evidence adequate to overcome every reasonable hypothesis of innocence, but only that an inference may reasonably be drawn from such evidence which supports the jury's findings. *Hall v. State* (1980), 273 Ind. 507, 514, 405 N.E.2d 530, 535. In reviewing sufficiency claims on appeal, we do not reweigh evidence or judge the credibility of witnesses. We look only to that evidence most favorable to the verdict and any reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value to support the verdict, it will not be disturbed. *Alfaro v. State* (1985), Ind., 478 N.E.2d 670, 672. Also, a motion for a directed verdict should be granted only where there is a total lack of evidence on some essential element and where the State has failed to establish a prima facie case. *Maisonet v. State* (1983), Ind., 448 N.E.2d 1052, 1054.

### (A)

Canaan first argues the evidence was insufficient to prove his identity as perpetrator of this crime. Witnesses testified that Keith Canaan came to their door at approximately 10:40 p.m. and attempted to sell his bicycle for $30. These witnesses were located one floor above Lori Bullock. A number of them saw and/or heard Canaan knock on the door of the apartment across the hall and Bullock's apartment. Canaan had been fidgeting with a pack of cigarettes. A package of "Kool" cigarettes was found on the stairs leading to the first floor of the building. Near the pack was saliva, and testing showed it to be from a type A secretor. Although a common type in the general population, it is also consistent with Canaan's. In addition, Bullock's boyfriend tried to call her a number of times that evening starting at approximately 11:00 p.m. but received no answer. Bullock was alive at 9:00 p.m., and received a phone call from Hillsmyer.

Some time before or after the murder occurred, the apartment was ransacked. A large number of items were taken from the apartment, including a box of spaghetti. This bore Canaan's fingerprint. Although he had been to the apartment two previous times, testimony indicates he did not touch anything in the kitchen area.

Bullock and Hillsmyer had been shopping the day of the murder. Lori had around $200 left after shopping, but her purse was found empty during the police investigation. Kevin Canaan testified that earlier that evening Keith had only a few dollars in his pocket. Much later the same evening, after having eaten in a restaurant and been drinking in at least one bar, Canaan was heard to count out quite a bit more money, over $100.

On the next afternoon Keith and Kevin Canaan were at the home of a friend, Mark Gilmore. Gilmore lived near Canaan. When the men saw police officers outside the Canaan residence, Canaan decided to leave. Kevin was able to persuade him to leave after dark. Canaan sent his brother to pack some clothes for him and asked that he destroy a pair of dark trousers he had worn the night before. Canaan told Kevin he had gotten in a fight the previous night and killed a biker at the Silver Dollar. Evidence showed, however, there were no fights there that evening and no one had been killed.

The jury may have reasonably inferred from this evidence that Canaan gained entrance to Bullock's apartment through an unlocked door, ransacked the apartment, and at some point encountered Bullock and stabbed her repeatedly with a kitchen knife. The identity evidence presented is sufficient to sustain the verdict on this issue.

### (B)

Canaan next contends the evidence was insufficient to sustain the verdict on the burglary charge. Canaan contends the elements of "breaking" and "building or structure" were not sufficiently proven. *See* IC 35-41-1-10. Because there was no sign of forced entry from the outer door, and only of the bedroom door, he claims the conviction cannot stand.

A "breaking" is established when even the slightest force is used to gain unauthorized entry: even opening an unlocked door is sufficient. *Trice v. State* (1986), Ind., 490 N.E.2d 757, 758-59. It is true that here the outer door to the apartment showed no signs of forced entry, but it is known that the locks on the door did not work properly. The deadbolt did not work well, and therefore Bullock habitually left it unlocked. The lock in the doorknob was so defective, even a change in air pressure caused by opening the outer entryway door would sometimes cause the apartment door to "pop" open. Police officers testified that when the deadbolt was not locked the door would open "with a good shove." In addition, there were signs of unauthorized entry. The apartment was ransacked, food items, clothing, and other household articles were strewn all over the apartment and outside the building. Lori Bullock was completely naked when she was found. Her roommate testified Lori never slept in the nude. One may infer from the fact towels were found near the bed where she was stabbed, that she was either getting into or out of the shower when Canaan attacked her. It is also highly unlikely she would have answered the door nude or dressed only in a towel. Another factor which shows unauthorized entry is that the door to Bullock's bedroom was smashed in. The jury determined from these facts that Keith Canaan broke and entered the building or structure within which Lori Bullock lived. There was sufficient evidence to support this finding.

### (C)

Canaan also claims the evidence is insufficient to sustain his conviction for attempted criminal deviate conduct.

The elements of criminal deviate conduct are stated in IC 35-42-4-2:

Sec. 2. A person who knowingly or intentionally causes another person to perform or submit to deviate sexual conduct when:

(1) the other person is compelled by force or imminent threat of force;

(2) the other person is unaware that the conduct is occurring; or

(3) the other person is so mentally disabled or deficient that consent to the conduct cannot be given;

commits criminal deviate conduct, a Class B felony. However, the offense is a Class A felony if it is committed by using or threatening the use of deadly force, if it is committed while armed with a deadly weapon, or if it results in serious bodily injury to any person other than a defendant.

Deviate sexual conduct is defined in IC 35-41-1-9:

Sec. 9. "Deviate sexual conduct" means an act involving:

(1) a sex organ of one person and the mouth or anus of another person; or

(2) the penetration of the sex organ or anus of a person by an object.

IC 35-41-5-1 defines the crime of attempt, in pertinent part, as follows:

Sec. 1 (a) A person attempts to commit a crime when, acting with culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same class as the crime attempted. However, an attempt to commit murder is a Class A felony.

Canaan specifically challenges the sufficiency of the evidence on penetration. He states penetration requires sexual manipulation and that none existed here. In support of his argument, Canaan cites *Rowan v. Owens* (7th Cir.1984), 752 F.2d 1186, *cert. denied* (1986), 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 691, a case involving criminal deviate conduct, not at-

tempt. We find this argument unpersuasive. The State need not establish there was penetration to support a conviction of attempted criminal deviate conduct. All that is necessary to support the conviction here is the State must prove beyond a reasonable doubt that Canaan, acting with culpability required for commission of the crime, engaged in conduct that constituted a substantial step toward commission of the crime. IC 35–41–5–1. Accordingly, insofar as the State did not prove penetration to support the conviction here of attempted criminal deviate conduct, *Rowan* does not apply. Canaan's next argument is that the State failed to establish beyond a reasonable doubt the requisite intent to support his conviction. We do not agree.

The following testimony of the pathologist who performed the autopsy on Bullock's body established that the victim's labia, part of the female sex organ, was cut by a knife:

Q: What is the labia?

A: The labia ia [sic] a part of the vulva which is the external genital organs or external sex organs of the female.

Q: What does it consist of?

A: It is basically in laymens' terms what is called the lips of the female genital organs, the labia.

Q: Does it cover the outer opening of the vagina?

A: Yes.

Q: Was the victim's labia penetrated on both sides with the knife?

A: Yes, it was.

Q: Were there any other parts of the female sex organs that were penetrated by the knife wounds that you have described?

A: No, they were not.

Q: There were three different areas in which penetration had occurred?

A: Yes.

Q: Did all of the wounds exit the body?

A: From this one entrance, yes, they did.

Q: Was the vaginal canal itself penetrated?

A: No, it was not.

Q: Was there any wound to that canal at all from what you could determine from your examination?

A: No, there was not.

Q: What is the vulva?

A: The vulva basically describes the external lips or the labia and the internal labia, the colitoris [sic] and the opening of the vaginal orifice.

Q: The labia would be part of the vulva?

A: Correct.

PROSECUTOR: NOTHING FURTHER CROSS EXAMINATION BY BARRY L. STANDLEY, CO–COUNSEL FOR DEFENDANT

... XQ: So we've got violation of the labia with the knife but no violation of the vestibule which is under the surface of the labia.

A: Correct.

XQ: And no violation of the vagina.

A: Right.

Canaan notes in his brief "[t]he evidence presented showed promiscuous stabbing of the body." The knife thrusts were in a downward motion and originated in the pubic area of the body. From this evidence, we find reasonable men could infer from the placement and direction of these thrusts an intent to penetrate the vagina itself. Apparently this is what the jury concluded since it convicted Canaan of attempted deviate sexual conduct. Given that this evidence suggests substantial steps were taken to enter the vaginal canal, and the physical evidence of three contiguous knife wounds shows the attacker got at least that far in his attempt, a reasonable man could also infer that some penetration, although slight, had also occurred. Additionally, as noted earlier, Bullock, not in the habit of sleeping unclothed, was totally nude when found. In light of this evidence, we cannot say the jury should not have had the opportunity to consider and either accept or reject the inference the knife Keith Canaan used to kill Lori Bullock penetrated her sexual organs in the manner contemplated by our statute.

It should be noted the United States Court of Appeals for the Seventh Circuit in

*Rowan v. Owens* stated the following at page 1189 of its Opinion:

> The point of section 35–42–4–2(b) [the precursor to the current deviate sexual conduct statute] is not to punish sexual mutilation as such ... there must still be penetration (however slight) in a sexual sense; and a cut on the outside of the female sexual organ is not such a penetration.

*Rowan,* 752 F.2d at 1189.

The State correctly points out the *Rowan* court relied on an earlier version of the deviate sexual conduct statute in reaching its decision. IC 35–41–1–2, in effect in 1978, defined deviate sexual conduct as being "an act of sexual gratification involving a sex organ of one person and the mouth or anus of another person." The statute was subsequently revised, and IC 35–41–1–9, which is applicable in the present situation, no longer requires the conduct to be an act of sexual gratification. Presumably this was a legislative reaction to the prevailing attitude that rape and other types of sexual attacks are not crimes of passion or sexual gratification, but rather, crimes of violence. The *Rowan* court specifically stated that based on the statute in effect, penetration in a sexual sense (sexual gratification) must have occurred to ultimately prove deviate sexual conduct. This is no longer required.

From the foregoing we conclude that the trial court did not err in denying Canaan's motion for a directed verdict on these issues.

### VII

Canaan argues the trial court erred in failing to grant a mistrial during the penalty phase of the trial. He bases this claim upon the fact the prosecutor made improper comments during his argument. The statements in question are as follows:

> Protection, the second reason you have for sentences. Protect the community and protect our fellow citizens. Only the death penalty can do that in this case. The death penalty will insure the community is protected, insure that the other people—well, you can say keep him in prison for the rest of his life or for a very long time and that will help protect the community. It may protect those on the streets if he doesn't ever get out, but it won't protect the other inmates in prison ...

> MR. STANDLEY: OBJECTION, Your Honor. The defendant requests a hearing outside the presence of the jury.

The court denied the motion for mistrial, but admonished the jury to disregard the objectionable comments. The State concedes the argument was improper and that *Hance v. Zant* (11th Cir.1983), 696 F.2d 940, *cert. denied* (1983), 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393, held it was improper to urge consideration for the future safety of other inmates as a factor in capital sentencing. It should be noted that this proposition was expressly overruled by the 11th Circuit Court of Appeals in *Brooks v. Kemp* (11th Cir.1985) (en banc), 762 F.2d 1383, 1398–99, 1411, *vacated on other grounds* (1986), 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732. *Brooks* held that although such arguments are dramatic, they are directly relevant to the consideration of whether a defendant would remain a threat to society. *Brooks,* 762 F.2d at 1411. Nevertheless, "it is most important that the sentencing phase of the trial not be influenced by passion, prejudice, or any other arbitrary factor. With a man's life at stake, a prosecutor should not play on the passions of the jury." *Hance,* 696 F.2d at 951 (citation omitted).

■ However, not every error which occurs entitles a party to have a mistrial declared. The trial court has broad discretion in determining whether to declare a mistrial, and ordinarily the prerogative to declare one will be exercised only as a last resort. In other words, the circumstances must be such that the trial cannot continue without subjecting the defendant to grave peril of grievous error. *Carman v. State* (1979), 272 Ind. 76, 78–79, 396 N.E.2d 344, 346. Only upon a finding of abuse of discretion will the trial court be reversed. *Perrault v. State* (1986), Ind., 490 N.E.2d 322, 324.

In *Hensley v. State* (1986), Ind., 497 N.E.2d 1053, this Court addressed the issue of prosecutorial misconduct and denial of mistrial motions made in response to alleged misconduct. "In reviewing a charge of misconduct, this Court first determines whether there was, in fact, misconduct by the prosecutor, and then considers whether that misconduct under all the circumstances placed the defendant in a position of grave peril to which he should not have been subjected." *Hensley*, 497 N.E.2d at 1057, citing *Maldonado v. State* (1976), 265 Ind. 492, 498–99, 355 N.E.2d 843, 848.

In this case the defense attorney cut short the prosecutor's argument. The prosecutor did not attempt to repeat the statements, and did not stray uninterrupted into forbidden ground as did the prosecutor in *Hance*. There the prosecutor went on something close to a tirade, and used any number of improper cliches, including his fear for the safety of his own family, of other prisoners, and even spoke of the Vietnam War. Clearly, no admonishment would have cured the error there. But here, the court properly instructed the jury to disregard the improper comment.

 In determining whether "grave peril" resulted, we look to the probable persuasive effect of the misconduct on the jury's decision, not the degree of impropriety of the conduct. *Maldonado*, 265 Ind. at 499, 355 N.E.2d at 848. We find no grave peril under these circumstances. The trial court did not abuse its discretion in denying the motion for mistrial.

### VIII

Canaan next argues the trial court erred in giving the jury an instruction on attempted criminal deviate conduct. He contends the evidence is insufficient to justify giving the instruction. More specifically, he challenges the evidence on the elements of specific intent and whether a substantial step to commit the crime was taken.

 Once again we note that in determining the sufficiency of the evidence, this Court does not reweigh evidence or judge the credibility of witnesses. We will not disturb a verdict based on substantial evidence of probative value. *Alfaro*, 478 N.E.2d at 672. To prove a defendant attempted to commit a certain crime, the State must show: 1) the defendant acted with a specific intent to commit the crime, and 2) that he engaged in an overt act which constitutes a substantial step towards the commission of the crime. *Zickefoose v. State* (1979), 270 Ind. 618, 622, 388 N.E.2d 507, 510.

 The court instructed the jury on the lesser included offense of attempted criminal deviate conduct. This is proper if there is evidence of probative value from which the jury could properly find the defendant guilty of such an offense. *Goodpaster v. State* (1980), 273 Ind. 170, 177, 402 N.E.2d 1239, 1243. Intent to commit a felony may be inferred from the surrounding circumstances of a crime. *White v. State* (1986), Ind., 495 N.E.2d 725, 727. Whether the defendant took a substantial step towards committing the crime is a question of fact for the jury to determine. *Dukes v. State* (1986), Ind., 501 N.E.2d 420, 421.

 In this case there is sufficient evidence to show Canaan took a substantial step towards committing criminal deviate conduct with the necessary specific intent. The State argues that the wounds to the victim's chest and neck clearly allow the inference Canaan intended to kill Lori Bullock, and the jury should have been allowed to infer from repeated stabs to the external portion of the female sex organ that he attempted to penetrate her vagina. We agree. These repeated knife thrusts in the genital area are also sufficient to constitute the requisite substantial step to prove attempt. The trial court did not err in giving the instruction on the lesser included offense of attempted criminal deviate conduct.

### IX

The final issue which we address is whether the trial court erred in failing to give three instructions which Canaan tendered to the court.

In determining whether an instruction was properly refused, this Court, on review, must consider: 1) whether the tendered instruction correctly stated the law; 2) whether there was evidence in the record to support giving the instruction; and 3) whether the substance of the tendered instruction was covered by other instructions given. *McKean v. State* (1986), Ind., 500 N.E.2d 1184, 1186. On review we are bound to consider the instructions as a whole. *Roland v. State* (1986), Ind., 501 N.E.2d 1034, 1040. The decision as to what instructions to give lies largely within the trial court's discretion. *Smith v. State* (1987), Ind., 506 N.E.2d 31, 33.

Defendant's Instruction No. 2, tendered during the habitual offender phase of the trial, reads as follows:

This is a criminal action and the Constitution of the State of Indiana makes the jury the judges of law, as well as of the fact[s], in criminal actions, *and the instructions of the Court are advisory only.*

It is not meant by this, however, that you may willfully and arbitrarily disregard the law, but it means that you should honestly, justly and impartially judge the law as it exists.

It is your duty to determine the law correctly. [Emphasis added.]

During the habitual phase of the trial, the court instructed the jury that in construing any one instruction, they should consider it with all other instructions given. The court also instructed the jury, at the conclusion of the guilt phase, that it was to determine the facts from the testimony and to determine the law from the instructions, and find its verdict accordingly.

As both the State and Canaan point out, Article I Section 19 of the Indiana Constitution provides: "In all criminal cases whatever, the jury shall have the right to determine the law and the facts." From this however, it does not follow that the judge's instructions are advisory only. We have said that when the court informs the jury they have the right to determine the law and the facts, this states the only legal proposition necessary to be laid down on that subject. No elaboration of it can make it any clearer. *Taylor v. State* (1981), Ind., 420 N.E.2d 1231, 1234, *citing Bridgewater v. State* (1899), 153 Ind. 560, 566, 55 N.E. 737, 739. The tendered instruction was not a proper statement of the law and the trial court did not err in refusing to give it.

Canaan bases his next claim of error on Instructions No. 5 and No. 6, tendered during the penalty phase of the trial, which read as follows:

Defendant's Instruction No. 5

I charge you that there is nothing which would suggest that the decision to afford an individual defendant mercy violates the Constitution.

Defendant's Instruction No. 6

In determining wether [sic] or not to recommend the death penalty in this cause you should look to your own background, experience, beliefs and convictions, as well as your feelings concerning the death penalty in deciding whether or not to recommend such a sentence in this case. If after examining your own background, experience and beliefs concerning the death penalty, you feel that the death penalty should not be given to the Defendant herein for any reason, you may elect not to recommend the death penalty in this case.

Canaan claims the court's failure to give these instructions is a failure to inform the jury of their constitutionally mandated role, and he was therefore denied his right to due process under the law. These instructions were tendered and refused during the penalty phase.

At this time the judge instructed the jury according to the provisions in IC 35–50–2–9, Indiana's death penalty statute. He stated that in addition to the mitigating circumstances he named, the jury could consider "any other circumstances appropriate for consideration." The jury was instructed that a guilty verdict does not itself constitute an aggravating circumstance, that the mitigating circumstances cited were only some of those to be considered in recommending a sentence, and

that any one was sufficient to support a recommendation against death. The jury was also told it should not limit consideration to only those specific factors but should look to any other appropriate factors and circumstances relating to the case in making a decision. The court told the jury that if mitigating outweighed aggravating circumstances, they may not recommend a death sentence.

An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him. And to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's "need for reliability in the determination that death is the appropriate punishment in a specific case." Indeed, by limiting the jury's sentencing considerations to record evidence, the State also ensures the availability of meaningful judicial review, another safeguard that improves the reliability of the sentencing process.

*California v. Brown* (1987), 479 U.S. 538, 543, 107 S.Ct. 837, 840, 93 L.Ed.2d 934, 941 (citations omitted).

■■■■ The Indiana statute requires the jury to find the State proved the existence of at least one aggravating circumstance beyond a reasonable doubt and weigh the aggravating against mitigating circumstances which exist. Our statute therefore adequately protects a capital defendant's right to be sentenced in a manner which is not arbitrary, freakish, or capricious. *Resnover v. State* (1984), Ind., 460 N.E.2d 922, 928, *cert. denied* (1984), 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160. Based on the above we find the trial court properly instructed the jury during the trial and the subsequent phases of the trial. We find the court did not abuse its discretion in refusing Canaan's tendered instructions.

■■■■ Having found no error after considering all of the issues Canaan raises, we must now examine whether the death sentence is appropriate in this case. The trial judge made written findings which stated Keith B. Canaan had been proved beyond a reasonable doubt to have murdered Lori Bullock on or about December 28, 1985 to December 29, 1985. The judge also found Canaan murdered her while committing burglary and attempted deviate sexual conduct. He added that Canaan was also proven to be an habitual offender.

The judge read through each possible mitigating circumstance provided in IC 35–50–2–9, and found none in this case. He did find a significant prior criminal history because Canaan had been convicted of five prior felonies. The judge found Canaan was not under extreme emotional or mental disturbance at the time of the crime, he found no evidence of consent on Bullock's part, and no evidence Canaan was only an accomplice whose participation was relatively minor. Further, he found no evidence he acted under the domination of another person, or that his capacity to understand the criminality of his conduct or to conform his conduct in accordance with the law was substantially impaired due to mental disease, defect, or intoxication. The judge found no other circumstances to mitigate the criminality of Canaan's actions. He found the aggravating circumstances outweighed the mitigating, and he properly considered the jury's recommendation and the information contained in the presentence report. The judge found, based on his knowledge of Canaan and of the law, that Canaan intentionally violated the law while not motivated to conform his conduct to standards which society requires. He concluded the proper punishment for Canaan was death by electrocution.

The record supports the judge's conclusion that Canaan murdered Lori Bullock, burglarized her apartment, and attempted acts of criminal sexual deviancy. It also shows him to be an habitual offender. We

therefore find and now hold that the death penalty as provided under Indiana statutes was not arbitrarily or capriciously imposed upon Canaan and is reasonable and appropriate in his case.

The trial court is affirmed and this case is remanded in order for the court to set a date for execution.

SHEPARD, C.J., and GIVAN, J., concur.

DeBRULER, J., concurs and dissents with separate opinion in which DICKSON, J., concurs.

DeBRULER, Justice, concurring and dissenting.

Appellant stands convicted of three separate offenses, namely, the murder of Lori Bullock, the burglary of Bullock's apartment, and an attempt to commit deviate conduct upon Bullock's person. Appellant stands sentenced to the death penalty under I.C. 35–50–2–9(b)(1) based upon the intentional killing of Bullock while committing the said burglary and the said attempted deviate conduct. Appellant claims on appeal that the evidence tending to show that he broke and entered the apartment, and tending to show that he attempted to penetrate the sex organ of the victim in stabbing her is insufficient to support the jury verdicts of guilty of burglary and attempted deviate conduct, the jury recommendation of death, and the judge's sentence of death. This claim is sound.

A conviction for a crime or the imposition of a death sentence based upon the contemporaneous commission of one of the separate crimes enumerated in I.C. 35–50–2–9(b)(1) cannot stand on appeal if the evidence in support of it is insufficient. Either must be set aside if the evidence, without weighing it or determining questions of credibility, lacks probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Howard v. State* (1982), Ind., 433 N.E.2d 753.

To prove burglary, the State must show a breaking and entering occurred. I.C. 35–43–1–4. Proof of a breaking and entering requires evidence of the application of some force or effort to overcome or remove a barrier. While there need not be an actual rupturing or breaking of the entry way, there must be a showing that force was used, however slight, to gain entry. *Willard v. State* (1980), 272 Ind. 589, 400 N.E.2d 151. Here there was no such evidence. The evidence showed that appellant knocked on the apartment door and that he was in the apartment. There was also evidence that the apartment door would open on occasion through the application of slight force. However, this does not constitute evidence that appellant applied any force to gain unauthorized entrance. *Howard*, 433 N.E.2d 753.

While it was only necessary to prove attempted criminal deviate conduct and not the completed crime of criminal deviate conduct, the evidence of an attempt to penetrate the sex organ of the victim with a knife was also insufficient. There were some twenty-two stab wounds to the body, many of which were sufficient alone to cause death. The heart was pierced. The throat was cut several times. There were multiple additional cutting wounds to the arms and legs. The pathologist testified that he was able to discern from his examination of the body that all wounds were inflicted in a flurry which lasted a matter of minutes. There was a large gaping wound in the pubic area above the pubic bone through which the knife entered several times, and was deflected downward by the pubic bone so as to cut the external labia. The knife did not enter the vagina or the area beneath the covering of the labia. This evidence shows no more than an undifferentiated criminal state of mind with contemporaneous homicidal conduct directed at the person as a whole. It does not show an attempt to penetrate the sex organ of the victim with the knife, as is contemplated in the criminal deviate conduct statutes. I.C. 35–42–4–21; I.C. 35–41–1–9.

The conviction for murder should be affirmed, however the convictions for burglary and attempted deviate sexual conduct should be reversed because of the lack of sufficient proof. On like basis, the sen-

tence of death should be vacated since it is based as well upon insufficient proof of the contemporaneous burglary and attempted deviate conduct, both essential elements of the aggravating circumstance warranting the death penalty, and the cause should be remanded for a sentence of years upon the murder conviction.

DICKSON, J., concurs.